USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 25, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                :

SEAN BRODEN,                     :

                                :

                Petitioner,       :      13 Civ. 2554 (KBF)

                                :      08 Cr. 142 (TPG)

            -v-              :

                                :      OPINION & ORDER

UNITED STATES OF AMERICA,    :

                                :

             Respondent.    :

                                :

-------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      Sean Broden, presently incarcerated at MDC Brooklyn pending his return to FCI Loretto, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence and judgment. Broden is currently serving a fifteen-year sentence imposed by the Honorable Thomas P. Griesa after a jury found Broden guilty of conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846.

      For the reasons set forth below, Broden's petition is DENIED.

I.     PROCEDURAL HISTORY

      Broden, along with two others (Isidro Alicea and Derek Shaw), was indicted on March 31, 2008, on a single count of conspiracy to distribute, and possess with the intent to distribute, 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. (Superseding Indicment, 08 Cr. 142, ECF No. 10.) Broden's two co-defendants entered into plea agreements with the government. On January

7, 2009, the government filed a Prior Felony Information against Broden, charging that in or about May 1996, he had been convicted in the United States District Court, Middle District of Pennsylvania, of conspiracy to distribute, and possess with intent to distribute, cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  (Prior Felony Information, 08 Cr. 142, ECF No. 18.)  Broden had been sentenced principally to 70 months' imprisonment for this prior conviction.  (Id.)[1]

Broden proceeded to trial by jury on the March 31, 2008 Superseding Indictment returned in this District.  Broden's trial occurred during the period November 16-23, 2009.  The jury returned a verdict convicting him of the single count charged in the Superseding Indictment.  Broden timely appealed his conviction, and raised the following arguments on appeal:  (1) insufficiency of evidence to support the verdict; and (2) that the district court erred in sentencing the defendant for conspiring to distribute 500 grams or more of cocaine because the jury, purportedly, was not instructed that it was required to make findings as to drug weight and type beyond a reasonable doubt.  United States v. Alicea, 450 F. App'x 84, 85 (2d Cir. 2011).  The Second Circuit affirmed Broden's conviction by summary order dated December 13, 2011.  Id. at 87.  Following the Second Circuit's affirmance of his conviction, Broden timely filed a petition for a writ of certiorari, which the Supreme Court denied on April 16, 2012.  Broden's judgment of conviction then became final on that date.

---

[1] The filing of the Prior Felony Information subjected Broden to the enhanced penalties of 21 U.S.C. §§ 812, 841(a), 841(b)(1)(B) and 846.  The mandatory minimum sentence for the count charged in the Superseding Indictment was thereby increased from five to ten years.

The instant petition pursuant to 28 U.S.C. § 2255 was deemed filed on April 16, 2013, and was therefore filed within the one-year statute of limitations imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  28 U.S.C. § 2255(f)(1).[2]  In the petition, Broden alleges fourteen different ways in which his trial, sentencing, and appellate counsel were ineffective:

> (1) trial counsel failed to move to dismiss the Indictment on the ground that it was not returned in open court (Petition ¶¶ 25, 66, ECF No. 2);

> (2) trial counsel failed to advise Broden of his right to testify (id. ¶¶ 32-33, 70);

> (3) trial counsel failed to inform Broden that the jury would learn of his prior conviction (id. ¶ 35);

> (4) trial counsel did not advise Broden of his right to seek a bench trial (id. ¶ 54);

> (5) trial counsel did not advise Broden of his right to seek a trial on stipulated facts (id.);

> (6) trial counsel did not pursue plea discussions with the government (id. ¶ 67);

> (7) trial counsel did not move to suppress certain recorded prison calls (id. ¶ 68);

> (8) trial counsel failed to investigate whether a potential witness, "E", could have provided exculpatory testimony (id. ¶ 69);

> (9) trial counsel failed to object to improper argument during the government's summation (id. ¶ 71);

> (10) trial counsel failed to seek an instruction that the jury determine the quantity of cocaine attributable to Broden (id. ¶ 72);

---

[2] This is Broden's first motion for collateral relief and is thus properly before the Court without the need for certification by the Second Circuit.  28 U.S.C. § 2255(h).

(11) trial counsel recused himself "at the last minute" from his sentencing and the new attorney appointed to represent Broden did not have adequate time to prepare for sentencing (id. ¶ 73);

(12) sentencing counsel failed to object to improper evidence used to determine Broden's Guidelines range (id.);

(13) appellate counsel failed to present the strongest issues on appeal; namely, appellate counsel failed to object to the government's violation of a stipulation in which it agreed that no evidence of Broden's prior conviction would be presented to the jury (id. ¶ 74); and

(14) all of Broden's attorneys had conflicts of interest (id. ¶ 75).

The petition was transferred to the undersigned on June 6, 2013. On November 6, 2013, the government opposed the petition but consented to an evidentiary hearing as to two issues: "(1) whether Stanislao A. German, Broden's trial counsel, informed Broden of his right to testify (Claim 2), and (2) whether Mr. German pursued plea discussions with the Government prior to the trial (Claim 6)." (Gov't Opp. at 1, 13 Civ. 2554, ECF No. 14.)

Accordingly, this Court held an evidentiary hearing on December 6, 2013 and January 27, 2014 with respect to these two issues. At that hearing, Broden stated that he did not write his petition (his mother obtained it from a paralegal) and that he did not understand all of the claims contained in it. (1/27/14 Hearing Tr. at 118-19, 13 Civ. 2554, ECF No. 24.) Following the hearing, the Court permitted both Broden and the government to make additional submissions in support of and in opposition to the petition. (13 Civ. 2554, ECF Nos. 22, 27.)

II.    FACTUAL BACKGROUND

The government's evidence at trial showed that Broden conspired, initially with Shaw, and later also with Alicea, to obtain wholesale quantities of cocaine in New York City.  The government's evidence included testimony from Shaw, who testified pursuant to a cooperation agreement, an Immigration and Customs Enforcement Special Agent to whom Broden made a post-arrest statement, recordings of telephone calls that Broden made while detained before trial, cell-site information, and audio and video recordings of a sting operation in which a confidential informant delivered two kilograms of sham cocaine to Broden, Shaw, and Alicea.  The evidence also included $20,980 in cash that the conspirators, including Broden, delivered to the informant.

In sum, the evidence described the following events: in late December 2007, Broden spoke via telephone with Shaw and requested that he assist him in locating 250 grams of cocaine that he could purchase.  (Trial Tr. at 328-33.)  At the time, Broden was living in Pennsylvania and Shaw was living in Brooklyn.  (Id. at 331.) Shaw agreed to help Broden find the cocaine, and contacted an individual named Dale.  (Id. at 332-34.)  After Dale indicated that he knew someone who "might have something," Shaw called Broden and told him to come to New York whenever he was ready to buy the cocaine.  (Id. at 334.)

On January 2, 2008, Broden drove to New York City with an individual whom they called "Mook-Mook or Moo-Moo or something like that."  (Id. at 335-36.) Broden and his companion met Shaw at a gas station, and the three of them drove

5

into Brooklyn together while Shaw tried to contact Dale on his cellular telephone. (Id. at 336-37.)  As they were driving together, Broden told Shaw that, if the drug transaction with Dale went well, Broden and Shaw could buy cocaine from him every week.  (Id. at 337.)  Broden, Shaw, and the third man drove around waiting for Dale to call, but ultimately Shaw told Broden that he did not think the cocaine deal would happen that day.  (Id. at 338.)  Broden and his companion then dropped Shaw off and returned to Pennsylvania.  (Id. at 339-40.)  Before leaving, Broden asked Shaw to "let him know what happened, and see what was going on with Dale" because Broden was "really trying to get something, some drugs."  (Id. at 340.)  Dale called Shaw approximately two days later and told Shaw that he had not called him back because he had been unable to locate a cocaine supplier.  (Id.)

Shaw also spoke with an individual whom he knew as "Comando," who worked at the VIP Bar (located at the corner of Nostrand Avenue and President Street in Brooklyn) and who told Shaw that he had found a supplier who would sell 250 grams of cocaine for approximately $8,000-$9,000.  (Id. at 341.)  Shaw called Broden and relayed the news he had received from Comando.  (Id. at 342.)  Broden responded that he wanted to buy the cocaine, and he drove to New York the next day, January 5, 2008, in order to go with Shaw to buy the drugs.  (Id. at 342-43.)  Broden, who was accompanied by a "short white guy" named "E," picked Shaw up at a gas station, and the three drove together to the VIP Bar.  (Id. at 343-45.)  During the drive, Broden stated that E was his partner, and that he hoped the deal with

Comando would work out better than his previous trip to New York to try to buy cocaine.  (Id. at 344-45.)

    Broden, E, and Shaw picked Comando up at the VIP Bar and drove to a second bar.  (Id. at 346.)  Comando and Shaw went into the second bar while Broden and E waited outside in the minivan.  (Id. at 346-47.)  After going into the bar and talking with Comando, Shaw determined that the cocaine supplier was not serious about selling cocaine to Shaw and Broden; Shaw left the bar and relayed that information to Broden, and the four men departed.  (Id. at 346-48.)

    After the failed attempts to buy cocaine described above, Broden asked Shaw to find out how much a full kilogram of cocaine would cost.  (Id. at 349.)  Shaw contacted Isidro Alicea, whom Shaw had met while previously incarcerated at a federal prison camp.  (Id. at 350.)  Alicea told Shaw that he could obtain a kilogram of cocaine for $21,000; Shaw relayed that information to Broden.  (Id. at 350-51.)  Broden responded that, "if it's on the up and up," he wanted to buy the cocaine, and Shaw responded that he was going to meet with Alicea to make sure that everything was okay.  (Id. at 351-52.)  The next day, Shaw visited Alicea at Alicea's home in the Bronx and the two discussed the proposed cocaine deal.  (Id. at 352-53.)  Shaw then called Broden, assured him that Alicea was "on the up and up," and the two agreed that Broden would come to New York from Harrisburg, Pennsylvania, the next day to buy the cocaine from Alicea.  (Id. at 353-54.)

    The following day, January 17, 2008, Broden, who was again accompanied by E, met Shaw at a gas station near New York City and the three men drove together

to the Bronx to meet Alicea.  (Id. at 356-58.)  Shortly after Broden and E arrived, while E was out of the car, Broden and Shaw had a private conversation during which Broden told Shaw that, if E asked how much the cocaine was going to cost, Shaw should tell E that it was $24,000.  (Id. at 355-57.)  Shaw understood that he and Broden would be able to split the $3,000 difference between the actual purchase price of the cocaine and the price that Broden had apparently told E.  (Id. at 357.)  Broden and E were behind schedule picking Shaw up because they had been delayed by snow between Harrisburg and New York City.  (Id. at 358.)  Because of the delay, both before and during the trip to the Bronx, Shaw spoke with Alicea several times via telephone in an effort to stall Alicea and his cocaine supplier who was supposed to deliver the cocaine to the deal.  (Id. at 356-58.)  Unbeknownst to Alicea, Broden, Shaw, and E, Alicea's purported supplier was actually a confidential informant (the "CI") who was working at the direction of investigating agents.  (Id. at 19-25.)

Broden, E, and Shaw got lost in the Bronx on their way to Alicea's house, and Alicea arranged for the CI (whom Alicea believed to be a wholesale cocaine supplier), who was in an SUV near Alicea's home, to call Shaw and arrange to meet him and to lead him and the others to Alicea's home.  (Id. at 359.)  Shaw then spoke with the CI by telephone and the CI drove to where Broden, E, and Shaw were waiting, and led them to Alicea's home.  (Id. at 359-60.)  After arriving at Alicea's home, the CI parked at one end of the block and waited in his SUV.  (Id. at 360.)  E

stayed in the minivan in which he had arrived with Broden and Shaw while Broden and Shaw went inside Alicea's home.  (Id.)

After Broden and Shaw entered Alicea's home, Broden and Alicea counted and bundled approximately $21,000 that Broden had brought with him.  (Id. at 362.)  Then, Broden, Alicea and Shaw walked out to the CI's SUV to complete the cocaine deal.  (Id. at 362-63.)  The CI remained in the driver's seat of the SUV while Shaw, Alicea, and Broden stood outside the vehicle.  (Id. at 85-86, 192-95, 201-02, 363-66; GX218.)  After some conversation primarily among Alicea, Shaw, and the CI regarding the deal, the CI showed the others a bag containing two kilograms of "sham" cocaine that the agents—who were surveilling and recording the meeting with audio and video equipment—had given the CI before the meeting.  (Trial Tr. at 44-45, 54-56, 80-84, 363-64; GX219.)  In addition to the kilogram of cocaine that he had brought for Broden and Shaw, the CI explained that he had brought a second kilogram of cocaine for Alicea.  (Trial Tr. at 364, 374-75; GX219.)

In response to a request from the CI, Shaw signaled Broden to show the money that he had brought; Broden pulled the money out from the pocket of his hooded sweatshirt and Shaw showed the money to the CI.  (Trial Tr. at 363-64.)  Broden and Shaw examined the kilograms of sham cocaine that the CI had brought, and Shaw tore open the package of one of the kilograms and he and Broden smelled the purported cocaine.  (Id. at 364-65, 372-73.)  After doing so, Broden stated, "I want that."  (Id. at 365, 372-73; GX219.)  Shaw returned the kilogram of purported cocaine that he and Broden had smelled to the bag containing the other sham

kilogram of drugs, which Alicea was holding.  (Trial Tr. at 365, 373-75.)  Shaw also

placed the money that Broden had brought on the passenger seat of the CI's SUV.

(Id. at 365, 374.)  After the money and purported cocaine had been exchanged, the

CI drove away and Broden, Shaw, and Alicea began walking toward Alicea's home.

(Id. at 87-89, 365-66, 374-75, 378.)

      Law enforcement agents moved in to arrest Broden, Alicea, and Shaw as they

walked away from the scene.  (Id. at 88-90, 195-96, 202-203, 365-66, 378-79, 454-56,

597.)  Shaw and Alicea ran, but Broden did not.  (Id. at 88, 195, 203-204, 365-66,

379-84, 455-58.)  As he fled, Alicea threw the bag containing the sham cocaine,

along with a cellular telephone, all of which were recovered by agents after they

caught and arrested Alicea a short distance away.  (Id. at 203-207; GX101; GX102A;

GX102B; GX104.)  As Shaw fled, one of the agents giving chase was hit and injured

by a car driven by another agent.  (Trial Tr. at 89-90, 457-58, 597-99.)  In the

ensuing confusion, Shaw escaped.  (Id. at 89-90, 379-81.)

      Although one of the investigating agents saw Broden at the scene—and got a

clear enough look at him to identify him in court—the agent did not question or

arrest Broden because he did not immediately recognize him as having been

participating in the drug deal.  (Id. at 456-61.)  During the time that Shaw was

running away from the scene, Broden tried repeatedly to call Shaw's cellular

telephone and left several voice mail messages for Shaw.  (Id. at 379-82.)  After

Shaw was safely away from the vicinity of Alicea's home, he spoke with Broden by

telephone.  (Id. at 382-83.)  Although Shaw believed that the people who had been

chasing him were law enforcement officers, Broden said that he did not think that was true, and Broden intimated that Shaw and Alicea had conspired to rob him of the money that he had brought for the cocaine transaction. (Id. at 382-85.)

After the injured agent was taken to the hospital by ambulance, investigating agents met the CI and recovered $20,980 from the bag that Shaw had placed in the CI's SUV. (Id. at 93-96, 195-98; GX103; GX305.)

Shortly after speaking with Broden, Shaw contacted the CI to try to determine whether he had anything to do with what had happened earlier that night. (Trial Tr. at 98, 384-93; GX 215.) At the direction of investigating agents, the CI denied having anything to do with the men chasing Shaw and Alicea, and agreed to meet Shaw the next day, purportedly to try to arrange for another drug transaction. (Trial Tr. at 97-98, 384-93; GX 215.) Shaw was arrested when he appeared for the meeting on January 18, 2008. (Trial Tr. at 98-100.) After Shaw's arrest, he was interviewed, participated in numerous proffer sessions, and ultimately pled guilty pursuant to a cooperation agreement.

On March 26, 2008, Broden was arrested at his home in Harrisburg Pennsylvania. (Id. at 107-108, 599-600.) After executing a written waiver of his Miranda rights, Broden agreed to be interviewed. (Id. at 110, 119-22, 600-603; GX 701.) During that interview, Broden made several contradictory statements regarding the January 17, 2008 sting transaction. For instance, while Broden admitted that he had been present with Shaw on the night of January 17, 2008, he denied that he had been there to buy narcotics and instead claimed that he

intended to go to Brooklyn to buy Gucci bags and leather coats.  (Id. at 122-24, 603;
GX702.)  Broden stated, however, that if there had been cocaine to be bought, he
would have bought it, although he also said that $21,000 was not enough money to
buy a kilogram of cocaine.  (Trial Tr. at 122-24, 127, 603; GX702.)  Broden further
claimed that Shaw had told him that there was "no action" in New York.  (Trial Tr.
at 127; GX702.)  Broden also stated that, on the night of January 17, Shaw had told
him that he was going to the Bronx "to pick up," which Broden understood to mean
that Shaw was going to buy narcotics.  (Trial Tr. at 127-28; GX702.)  Broden then
told his interviewer that E stayed in the car and did not know anything.  (Trial Tr.
at 126; GX702.)  Broden admitted that some of the $20,980 seized on January 17
belonged to him, and stated that the remainder belonged to E and Shaw.  (Trial Tr.
at 122, 126-27, 603; GX702.)  Broden also said that, after the sting transaction on
January 17, he assumed that Shaw had been trying to rob him.  (Trial Tr. at 127;
GX702.)  The interviewing agent took notes during Broden's interview and at the
end of the interview he asked Broden to review the notes and sign them to confirm
that they accurately reflected what Broden had said.  (Trial Tr. at 122, 124; GX702.)
These notes, bearing Broden's signature, were introduced at Broden's trial as
Government Exhibit 702.

After he was arrested, Broden was temporarily held in the Dauphin County
Prison where, pursuant to standard operating procedure, his telephone calls were
recorded.  (Trial Tr. at 128-31; GX733; GX734.)  At trial, the government introduced
excerpts of five telephone calls Broden made to various people from prison.  In each

of those calls, there was a recorded preamble in which the prison telephone system informed the participants in the call that the call may be recorded.  (See GX220; GX222; GX223; GX226; GX227.)  Broden discussed various subjects in these calls, including the reaction of E to Broden's arrest and Broden's desire for E to testify at trial as Broden's "secret weapon" by testifying that Broden had not come to New York to buy drugs.  (See GX220; GX222; GX223; GX226; GX227.)

In an effort to impeach Shaw's testimony that Broden traveled to New York with someone named "Mook-Mook or Moo-Moo or something like that" on January 2, 2008, the defense called a single witness, Lamont Jones, who testified that he was known by the nickname "Mont Mont," and that he had been a friend of Broden's for approximately 20 years.  (Trial Tr. at 607-609.)  Jones further testified that he had not accompanied Broden on a trip to New York on January 2, 2008, and that Jones was incarcerated for the entire month of January 2008.  (Id. at 609.)

Following his conviction but prior to sentencing, Broden sent a letter to Judge Griesa, the presiding trial judge.  In that letter, Broden alleged that his trial counsel, German, had been ineffective.  German thereafter made an application to be relieved as counsel to Broden, and Judge Griesa granted that application.  Judge Griesa then appointed Neil B. Checkman, Esq., to represent Broden going forward. (08 Cr. 142, ECF Nos. 54-55.)  James M. Branden, Esq., subsequently made an appearance and represented Broden for purposes of sentencing.  (08 Cr. 142, ECF Nos. 57, 59-61.)

On November 23, 2010, Judge Griesa sentenced Broden to fifteen years'
imprisonment to be followed by eight years of supervised release.  (Judgment, 08
Cr. 142, ECF No. 62.)

III.   THE EVIDENTIARY HEARING

On December 6, 2013 and January 27, 2014, this Court held an evidentiary
hearing on two issues:  whether Broden had been advised of his right to testify at
trial and whether his counsel had appropriately pursued plea negotiations with the
Government.  (12/6/13 Hearing Tr. at 2-3, 13 Civ. 2554, ECF No. 18.)

Broden was present at both hearing sessions with his counsel, Judith Vargas,
Esq.  In advance of the first hearing session, the Court appointed Ms. Vargas to
represent Broden pursuant to the Criminal Justice Act.  (12/5/13 Order, 13 Civ.
2554, ECF No. 17.)  Ms. Vargas met with Broden in advance of the first hearing and
was present at the December 6, 2013 hearing.  (12/6/13 Hearing Tr. at 3.)  At the
conclusion of the December 6 hearing, the Court adjourned the hearing in order to
provide Ms. Vargas an opportunity to meet further with her client, to familiarize
herself with the trial record, and to prepare any additional evidence.  (Id. at 41-43,
53.)  At the hearing on January 27, 2014, at which Ms. Vargas was also present, the
Court asked whether counsel believed an evidentiary hearing was necessary as to
any issues other than the two which it had indentified.  (1/27/14 Hearing Tr. at 9-
11.)  Ms. Vargas stated that she had not focused on that point; the Court requested
that she notify the Court as part of her post-hearing submission if she believed a
hearing on any other issues would be necessary.  (Id. at 150-51.)  In her post-

14

hearing submission, Ms. Vargas confirmed that Broden is not requesting any additional evidentiary hearing as to the remaining asserted bases for habeas relief in Broden's petition.  (2/3/14 Letter at 1, 13 Civ. 2554, ECF No. 22.)

At the hearing on December 6, 2013, the Court noted that Broden's bases for habeas relief which presumed actual innocence were in conflict with his argument that his trial counsel failed in pursuing plea negotiations on his behalf.  (12/6/13 Hearing Tr. at 6-8.)  The Court noted that in order for petitioner to enter a guilty plea he would have had to admit that he was in fact guilty.  (Id. at 7.)  In a letter January 14, 2014, Broden wrote the Court a letter, in which he stated: "In March 2008, driven by an economic need to fulfill my family support responsibilities, I chose the easy and wrong path by making contact with a person for the purpose of intending to sell drugs."  (1/27/14 Hearing Tr. at 3, 109-110.)

At the evidentiary hearing, Stanislao German, Broden's trial counsel, testified.  The Court found him very credible, articulate, and detailed.  The Court credits his version of events in all respects.  Broden also testified in support of his petition; during his testimony he conceded that he had in fact engaged in the narcotics conspiracy charged.  (Id. at 110-11.)  While the Court found him to be earnest, the Court also found his testimony with regard to the two key issues—his interest in and communications regarding a plea and his decision not to testify— lacked credibility.  Broden seemed willing to say whatever he thought would best support his petition, irrespective of the truth.

German testified credibly as to the following facts:

- At the time he commenced his representation of Broden, he had a number of years of experience in federal criminal cases, including through trial (12/6/13 Hearing Tr. at 11);

- He met with Broden on 15-20 occasions (id. at 11);

- He advised Broden repeatedly regarding the potential for a plea deal (id. at 14-15);

- Once Broden was released on bail, Broden maintained that he was innocent and would not plead guilty (id. at 14-15);

- There was a videotape of the narcotics transaction; Broden's defense was "mere presence" (but no involvement) in the transaction (id. at 18);

- German nevertheless had plea discussions with the government (id. at 15-16):

- Following discussions with the government as to what a plea deal would look like, German conveyed that information to Broden; Broden maintained that he was not interested (id. at 15-16);

- In December 2008, the AUSA on the case informed German that the government was going to file a Prior Felony Information if there was no plea in short order (id. at 16);

- German conveyed this information to Broden, including the fact that the filing of a Prior Felony Information would result in an increase in

mandatory minimum Broden was facing from five to ten years (id. at 16);

- German recommended that Broden speak with his family; Broden subsequently called him back and told him he was not interested (id.);

- The Government filed a Prior Felony Iinformation on January 7, 2009 (id. at 18);

- The Government also produced a series of recorded prison calls which were highly incriminating and suggested that Broden had been attempting to fabricate testimony for an alibi from the individual known as "E" (id.);

- German deemed these calls "extremely, extremely bad," and that "it was basically a confession" (id. at 17);

- German travelled to Harrisburg, Pennsylvania to meet with Broden at a church, and recommended that Broden plead guilty despite the ten year mandatory minimum rather than proceed to trial (id. at 18-20);

- German provided Broden with a CD of the prison calls and told him that Broden had to listen to them because he did not know how they were going to handle them at trial (id. at 18);

- Broden once again stated that he would not plead and wanted to go to trial (id. at 19-20);

- Broden's position was that he had simply been coming to New York City to shop and that the money he had was for that purpose (id. at 23);

- Broden had previously been stopped on the New Jersey Turnpike and had given a similar excuse after the State Troopers who stopped him found cash and drugs in the car; German did not think this excuse would work in this case, especially because the government had stated that, if Broden took the stand and presented this excuse, they would call the State Troopers who had stopped him previously on the New Jersey Turnpike (id. at 23-24);

- German informed Broden of his right to testify, and that the decision to do so was his and his alone (id. at 25-26);

- Broden chose not to testify and informed German of that decision during the course of the trial (id. at 28); and

- With respect to "E", German testified that despite many telephone calls to numbers for him, "E" never responded; and despite travelling to Pennsylvania to meet with him, he did not show (id. at 26-27).

At the January 27, 2014 hearing session, Broden testified as follows:

- That he was in fact guilty—while he only wanted to purchase 250 grams of cocaine for himself, he was guilty for conspiring with others to purchase 500 or more grams of cocaine (1/27/14 Hearing Tr. at 110, 145);

- Broden wanted to testify in order to let the jury know that he was not a "monster" and that he had made a mistake, and that he would have provided information relevant to sentencing but not to guilt (id. at 88, 124); and

- Broden conceded that he made the ultimate decision as to whether he would testify or not (id. at 94-95).

## IV.  LEGAL STANDARDS

All fourteen bases in Broden's petition allege ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) his or her counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) he or she was prejudiced by counsel's deficient performance.  See Strickland v. Washington, 466 U.S. 668, 687-96 (1984).

As to the first prong of the Strickland test, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel.  Id. at 688-89.  Reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that [t]here are countless ways to provide effective assistance in any given case and that [e]ven the best criminal defense attorneys would not defend a particular client in the same way."  United States v.

Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (internal quotation marks omitted) (citing Strickland, 466 U.S. at 689).

As to the second prong, the petitioner must show that, but for the deficient performance, there is a reasonable probability that the result would have been different. Strickland, 466 U.S. at 694. More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693. The Second Circuit has rejected § 2255 petitions based on ineffective assistance of counsel because a petitioner is unable to show prejudice in light of "overwhelming evidence of guilt adduced at trial." Strouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991); see United States v. Simmons, 923 F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against him, there is little reason to believe that alternative counsel would have fared any better."); United States v. Reiter, 897 F.2d 639, 645 (2d Cir. 1990) (similar). The required showing is even more difficult in cases where a petitioner makes statements in open court describing his or her conduct, or expressing an understanding of his or her rights; courts afford "a strong presumption of verity" to such statements. See Blackledge v. Allison, 431 U.S. 63,73-74 (1977).

"Every criminal defendant . . . is privileged to testify in his own defense, or to refuse to do so." Harris v. New York, 401 U.S. 222, 225 (1971). As a result, "counsel must inform the defendant that the ultimate decision [of whether to testify] belongs

to the defendant, and [that] counsel must abide by the defendant's decision on this matter." Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997).

Moreover, "[t]he decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal case.  This decision must ultimately be left to the client's wishes. . . . [C]ounsel may and must give the client the benefit of counsel's professional advice on this crucial decision." Boria v. Keane, 99 F.3d 492, 496-97 (2d Cir. 1996) (citations omitted).  Defense counsel has a "constitutional duty" to convey any plea offers from the government and to provide advice to their clients regarding the "crucial decision" whether to accept a plea offer. Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (citation omitted).  "Even if there might be circumstances where defense counsel need not render advice as to acceptance of a plea bargain, there can be no doubt that counsel must always communicate to the defendant the terms of any plea bargain offered by the prosecution." Cullen v. United States, 194 F.3d 401, 404 (2d Cir. 1999).

The Second Circuit has recognized that, when assessing ineffective assistance claims concerning plea offers, "in most circumstances a convicted felon's self-serving testimony is not likely to be credible." Purdy v. Zeldes, 337 F.3d 253, 259 (2d Cir. 2003).  Nevertheless, "[t]his does not relieve habeas courts of their responsibility to actually make a credibility finding in each case, even absent objective evidence." Id.

V.     APPLICATION

A.     Lack of Prejudice

Broden cannot meet the required showing of prejudice under Strickland by having been found guilty of a crime which he now concedes he committed. Accordingly, even if this Court were to find that Mr. German's performance before and during trial was deficient in some way, these arguments (Claims 1 through 11, as set forth in Section I supra) are insufficient to merit relief under 28 U.S.C. § 2255 on the basis of ineffective assistance of counsel.  See Strickland, 466 U.S. at 693-94. In addition, based on the videotape, audiotape, prison telephone calls, cell-site data, and testimony from his co-conspirator, Broden's conviction merely confirmed the otherwise overwhelming evidence of guilt.  See Strouse, 928 F.2d at 556; Simmons, 923 F.2d at 956; Reiter, 897 F.2d at 645.

B.     Plea Discussions

Broden has argued that Mr. German failed to ask the AUSA in charge of his case for a plea deal, that he wanted to plead guilty, and that, if he had received a plea deal and pled guilty pursuant to it, he would have received a lower sentence than that which he is now serving.  (1/27/14 Hearing Tr. at 71-77, 82-83, 91-92.) These arguments lack merit.

The Court credits the testimony of Mr. German.  Mr. German testified that he repeatedly discussed with Broden whether he wanted to pursue a plea and that Broden repeatedly professed his innocence and repeatedly stated a lack of desire to plea after getting out on bail.  Mr. German provided detailed testimony of the

events surrounding the government's filing of the Prior Felony Information and his attempt to get Broden interested in a plea at that time, as well as his trip to Harrisburg, Pennsylvania to discuss a plea with Broden after the production of the prison telephone calls.  The Court credits Mr. German's testimony that he repeatedly tried to get Broden to plea and that Broden made the affirmative decision to proceed to trial.

The Court finds no basis in the record to support an argument that Broden was not adequately informed of the possibility of a plea.  That Broden now wishes he had made a different decision is clear, but Mr. German is not responsible for that choice.

C.    Broden's Right to Testify

Broden argues that Mr. German provided ineffective assistance by not counseling him appropriately with regard to his right to testify.  This argument also lacks merit.  As an initial matter, Broden has conceded his guilt for the offense charged in the Superseding Indictment.  He could not have provided exculpatory testimony on his own behalf without having engaged in perjury.  In such circumstances, he cannot show he was prejudiced by his failure to testify.

This argument fails for additional reasons.  The Court credits Mr. German's testimony that he discussed with Broden his constitutional right to testify and that Broden was the ultimate decision maker on that issue.  Broden himself concedes that he made the ultimate decision not to testify.  Those two points put any argument regarding his failure to testify to rest.

D.    Other Bases

Broden's arguments on all additional grounds fail as well.

    1.    The Indictment

Broden has not argued that the Indictment is substantively defective. Instead, he makes the procedural argument that German provided ineffective assistance by failing to move to dismiss it because it was not returned by the Grand Jury in open court pursuant to Rule 6(f) of the Federal Rules of Criminal Procedure.

    This argument lacks merit.  It is standard practice for Indictments in the Southern District of New York to be returned in open court before a Magistrate Judge.  There has been no showing that this procedure was not followed with respect to this Indictment; there has been no showing that German was ever aware of a procedural deficiency.  German cannot be faulted for failing to make a motion for which he had no basis.

    2.    Failure to inform Broden that his prior conviction would be
           introduced at trial

Broden claims that, had he known that evidence of his prior conviction might be allowed in at trial, he would have testified.  This is demonstrably false.  Mr. German and Broden testified that Broden's decision not to testify was made while the trial was in progress, and chronologically following the testimony of Shaw that he had met Broden in prison.

    3.    Bench versus jury trial

Broden argues that German failed to inform him of his right to proceed by bench trial or trial on stipulated facts.  Both arguments are without merit.  The

evidence of guilt adduced at trial was overwhelming and Broden has not demonstrated how the outcome would, could, or should have been different under either scenario.

        4.     <u>Motion to suppress the prison calls</u>

Broden argues that German should have moved to suppress the prison calls on the basis that he did not have prior notice that they were being recorded. Such a motion would have been frivolous. Each of the calls had a preamble at the beginning warning the participants that the call might be recorded.

        5.     <u>Failing to call "E" as a witness</u>

Broden argues that Mr. German was ineffective for failing to investigate E's potential testimony and to call him at trial. This argument lacks merit for the simple reason that E could not have provided exculpatory testimony since Broden has conceded he is guilty. Thus, the alleged alibi would have been perjurious.

In addition, Mr. German made more than adequate efforts to locate and speak with "E" before trial, to no avail. There was nothing inadequate about Mr. German's efforts regarding "E" and his possible testimony or assistance.

        6.     <u>The government's closing argument</u>

Broden argues that Mr. German provided ineffective counsel by somehow not objecting during the government's summation. He provides no detail as to what was allegedly objectionable and the Court finds no error. This argument lacks merit.

7.    The verdict form

Broden argues that Mr. German provided ineffective assistance by failing to seek a verdict form that required the jury to determine the quantity of narcotics attributable to Broden.  This argument lacks merit.  First, Broden has conceded that while he personally wanted 250 grams of cocaine, he was part of a conspiracy to purchase 500 grams of cocaine.  Broden therefore cannot have suffered any prejudice as a result of Mr. German's failure to request that the jury make a finding as to a particular amount.  Secondly, this issue was previously implicitly decided by the Second Circuit in its affirmance of Broden's conviction.  See Alicea, 450 F. App'x at 86-87.  The law is clear that once "a matter has been decided adversely to a defendant on direct appeal, it cannot be relitigated in collateral attack."  United States v. Natelli, 553 F.2d 5, 7 (2d Cir. 1977).  There has not been any intervening change of law that would allow for a motion for reconsideration.  United States v. Loschiavo, 531 F.2d 659, 664 (2d Cir. 1976).

8.    Sentencing arguments

Broden also makes a series of arguments relating to ineffective assistance of counsel in connection with his sentencing.  Each is without merit.

Broden's first argument is that sentencing counsel had insufficient time to prepare.  This argument lacks merit.  On June 2, 2010, Mr. German withdrew as Broden's counsel after Broden had written to Judge Griesa asserting that Mr. German had been ineffective.  On September 30, 2010, Mr. Branden appeared for Broden.  Within a few days, Mr. Branden moved to adjourn Broden's sentencing

26

date to allow him additional time to prepare; this application was granted.  The sentencing date was adjourned for six weeks.  Mr. Branden filed a supplemental sentencing memorandum on October 27, 2010.  Broden was sentenced on November 23, 2010.  On this record, there is no basis to suggest that Mr. Branden had insufficient time or, that if he believed he needed more time, he was incapable of asking for it.

In addition, Broden argues that Mr. Branden did not make certain arguments on his behalf yet Broden fails to suggest what arguments should have been made that were not, and how he believes they would have resulted in a lower sentence.  The facts with respect to the sentencing suggest that Mr. Branden was entirely effective—the 180 months' imprisonment that Broden ultimately received was half of the low end of his Guidelines range of 360 months' imprisonment.

### 9.   Ineffective assistance on appeal

Broden argues that his appellate counsel was ineffective for failing to appeal the government's "violation" of a trial stipulation.  There is no evidence of such a stipulation, let alone a "violation."  This argument lacks merit.

### 10.   Conflicts of interest

Broden argues that all of his attorneys suffered from conflicts of interest.  He provides absolutely no support for this argument.  There are no facts in the record suggestive of any conflict.  This final argument is also without any merit.

VI.    CONCLUSION

For the reasons set forth above, Broden's petition to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 is DENIED.

The Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); see Matthews v. United States, 682 F.3d 180, 185 (2d Cir. 2012).

The Court also finds, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from the denial of this motion would not be taken in good faith.  See Feliz v. United States, No. 01 Civ. 5544 (JFK), 2002 WL 1964347, at *7 (S.D.N.Y. 2002).

The Clerk of the Court is directed to terminate the action 13 Civ. 2554.

SO ORDERED.

Dated:        New York, New York
              March 25, 2014

_____
       KATHERINE B. FORREST
       United States District Judge

Copies to:

Sean Broden
Reg # 08127-067
MDC Brooklyn
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, NY 11232

Sean Broden
Reg # 08127-067
FCI Loretto
P.O. Box 1000
Loretto, PA 15940